UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC HOUSTON,

    Petitioner,

v.

R. LOPEZ, Warden,

    Respondent.

Case No. 11-cv-03207-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Eric Houston, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse. For the reasons set forth below, the petition is denied.

## I. PROCEDURAL HISTORY

On June 27, 2008, an Alameda County jury found petitioner guilty of one count of first degree murder (Cal. Penal Code § 187 (a)[1]) with enhancements for use and intentional discharge of a firearm and infliction of great bodily injury (§§ 12022.5(a); 12022.7(a); 12022.53(b), (c), (d)); one count of assault with a firearm (§ 245(a)(2)) with enhancements for use of a firearm and infliction of great bodily injury on a child (§§ 1203.06 (a)(1); 12022.5(a); 12022.7(d)); one count of shooting at an occupied motor vehicle (§ 246) with enhancements for use and intentional discharge of a firearm and infliction of great bodily injury upon a child (§§ 12022.7(a), (d); 12022.5(a); 12022.53(b), (c), (d)); and one count of possession of a firearm by a felon (§ 12021

---

[1] Except as otherwise specified, all statutory references herein are to the California Penal Code.

(a)(1)). (Ex. 1 at 439-42.)[2] Petitioner was sentenced to an aggregate term of 57 years and 4 months to life. (Ex. 3 at 1122.)

Petitioner directly appealed the judgment in the California Court of Appeal. On January 13, 2010, in a reasoned opinion, the California Court of Appeal affirmed. (Ex. 7.) On March 30, 2010, the California Supreme Court summarily denied the petition for review. (Ex. 9.)

The instant petition was filed on June 28, 2011.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[3]

> On December 11, 2006, around 9:30 a.m., Daniel Leon picked up Luis Martinez from the home of their mutual friend, Joshua Ropati, on 101st Avenue near Birch in Oakland. Leon was driving a purple Buick Regal. Leon was a known narcotics dealer, and his "turf" was 100th Avenue and above. Leon and Ropati sold heroin in this neighborhood. After Leon picked up Martinez, they drove around the neighborhood and "hit some corners" to sell heroin.
>
> At around noon on that date, Jose Rodriguez and his family were driving on 101st Avenue. Carlos Rodriguez, Jose's brother, sat next to Jose in the front seat while Jose's wife sat in the back seat with their four-year-old daughter, Jane Doe. Leon was driving behind the Rodriguez family, and Luis Martinez was in the passenger seat. The Rodriguez family stopped at a stop sign at the intersection of 101st Avenue and Plymouth Street.
>
> As the Rodriguez's vehicle drove into the intersection, [petitioner] exited the passenger side of a vehicle parked near the intersection. He began shooting at Leon. [Petitioner] fired at least 13 shots from a semiautomatic AK-type rifle using 7.62 millimeter ammunition.
>
> Jose Rodriguez heard the shots behind him and pulled his car to the side of the road. Leon's car drove past Rodriguez on his left. Another friend of Leon, Sarah Ropati, was driving toward the intersection at that time from the opposite direction. Ms. Ropati saw a single shooter standing in the middle of Plymouth firing a gun with a banana clip at Leon who had at that point driven past the shooter. [Petitioner] ran forward, continuing to shoot, and then entered a waiting vehicle and fled.

---

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

[3] This summary is presumed correct. See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Leon was hit twice in the back and began to swerve. His car eventually crashed through the fence of a home a couple blocks away from the shooting, at the corner of 101st Avenue and Birch, near the Ropati's home. He died at the scene. Martinez was not hit and subsequently identified [petitioner] as the shooter.

Rodriguez's four-year-old daughter, Jane Doe, was struck in the lower back by two bullet fragments that penetrated the tailgate and backseat and which lodged less than an inch from her kidney, large intestine, and spinal cord. The bullet fragments could not be removed and remain in her back.

No shell casings, guns or other weapons were found inside Leon's vehicle or near the area where his car came to rest. Tar heroin was found in the door handle area on the driver's side of the car.

About five hours later on the same day, a close friend of [petitioner's], Marquies Burton (also known as "Little Flip") was shot. Jermaine Nelson, who was like an uncle to Burton, heard about the shooting and went to Highland Hospital, arriving ahead of the ambulance carrying Burton. [Petitioner], whom Nelson had known for years and whom he also knew as "Feez," called Nelson and said that he was just outside the building and was coming inside to wait with Nelson. When [petitioner] entered the hospital waiting room, Nelson noticed a group of young African-American and Latino men looking strangely at [petitioner]. Nelson asked [petitioner] why the crowd was looking at him. [Petitioner] said that they were "Niggas from Walnut," meaning rivals associated with a drug territory in "the nines" with whom he had just "got into it." [Petitioner] told Nelson that he had "just knocked a boy down," meaning that [petitioner] just shot one of their associates, whom he referred to as "the Mexican." [Petitioner] said "the Mexican" had been "hustling." [Petitioner] later told Nelson that he had shot "the Mexican" using an "AK" and 7.62 caliber ammunition.

Tanika Smith told Oakland Police Sergeant Tony Jones that right after the shooting of Leon, Houston, whom she knew as "Little Feez," said to her that he had just "smoked me a Nigga." She identified [petitioner] from a photo lineup as the person she knew as "Little Feez." At trial, Smith denied speaking to Sergeant Jones, denied making any statement or identification, and denied that she knew [petitioner]. Sergeant Jones testified as to Smith's prior statements, and that she also told him "[t]hat the person was going to kill [petitioner] but he killed the person first."

Ronald Creggett, who was selling drugs a block away at the time of the shooting, also identified [petitioner], whom he knew as "Little Feez," as the shooter in an in-custody statement to Sergeant Jones. At the preliminary hearing he recanted his statements.

Police arrested Houston on January 24, 2007. A search of [petitioner's] room revealed a box of 7.62 millimeter ammunition, with 10 bullets missing from the box. A manufacturer's "headstamp" marking on the cartridges matched that on the shell casings found at the scene of the shooting of Leon and Jane Doe.

[Petitioner] did not testify. His defense was that he was not the shooter. [Petitioner's] mother testified that [petitioner] lived primarily with her in Sacramento, and that he went

3

to Oakland to visit his father only about every other weekend and never for any extended period. Defense counsel attacked the credibility and motives of the prosecution's witnesses and emphasized conflicting descriptions given of the shooter which differed from [petitioner].

The defense also called Rebecca Shrader, who testified that at about 11:30 a.m. on the date of the shooting, she saw Leon open the trunk of a beige sedan parked in front of her house. The trunk contained about six guns, and she saw Leon remove a machine-gun and drive off with it in his purple vehicle.

The information filed against [petitioner] charged murder with enhancements for infliction of great bodily injury and use of a firearm in the commission of the offense (§§ 187, subd. (a); 12022.5, subd. (a); 12022.7, subd. (a); 12022.53, subds. (b), (c), (d)); assault with a firearm with enhancements for use of a firearm and infliction of great bodily injury on a child (§§ 245, subd. (a)(2); 1203.06, subd. (a)(1); 12022.5, subd. (a); 12022.7, subd. (d)); shooting at an occupied motor vehicle with enhancements for use and intentional discharge of a firearm and infliction of great bodily injury upon a child (§§ 246; 12022.7, subds. (a), (d); 12022.5, subd. (a); 12022.53, subds. (b), (c), (d)); and possession of a firearm by a felon (§ 12021, subd. (a)(1)). On May 13, 2008, the jury returned verdicts of guilty on all charged counts and found all enhancement allegations true.

People v. Houston, No. A122033, 2010 WL 109714, at *1-3 (Cal. Ct. App. Jan. 13, 2010) (footnotes omitted).

## III.  DISCUSSION

A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the

constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

B.  Petitioner's Claim

Petitioner's sole claim herein is that the trial court violated his right to due process by failing to give *sua sponte* instructions on an imperfect self-defense theory of voluntary manslaughter as a lesser-included offense of murder. The state appellate court disposed of this claim on state law grounds.

A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation omitted). Due process does not require an instruction be given unless the evidence supports it.

5

1   See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense required only "when the evidence warrants such an instruction"). Moreover, "[a] state trial court's refusal to give [a requested] instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). "The error must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment. Id. "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987). A habeas petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

Here, the claim fails for at least three reasons. First, petitioner fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as this, does not present a federal constitutional claim. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

Second, the state appellate court determined that there was insufficient evidence to support an imperfect self-defense instruction. The court explained:

> Imperfect self-defense is a description of one type of voluntary manslaughter. (*Barton*, *supra*, 12 Cal.4th at pp. 200-201.) "'"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.]'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez* ).) "'[T]he doctrine is narrow. It requires without exception that the defendant must have had an actual belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm no matter how great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with.'" . . . [Citation.]' [Citations.]" (*Ibid.*, only citation omissions added.)

United States District Court
Northern District of California

> The evidence that [petitioner] contends supports his theory of imperfect self-defense is: (1) Tanika Smith's statement to police that [petitioner] had said that the person he killed was going to kill him, but that he killed the person first; (2) the testimony of Rebecca Shrader that the victim possessed a machine gun at a time shortly before the killing; (3) testimony that, although no guns were found in Leon's car, a crowd had gathered around the car after the shooting and before police arrived; and (4) a close friend of [petitioner's] was shot in apparent retaliation "moments" after Leon was killed.
>
> None of this evidence, however, supports an inference that at the time of the shooting [petitioner] "actually, but unreasonably, believed he was in imminent danger of death or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) The trial testimony was that [petitioner] waited in ambush for Leon, spraying the victim's car with fire from an automatic weapon, ultimately shooting him in the back. There was neither witness testimony nor any physical evidence that the victim had or used a weapon at the time of the killing, and it is only speculation that someone at the scene may have removed a weapon before police arrived. There was no evidence that [petitioner] expressed any such fears when he arrived at Highland Hospital, about five hours after the shooting of Leon, and confronted associates of the victim there.
>
> There was no evidence from which a jury could conclude that [petitioner] was ever in any actual or apparent imminent peril. The testimony "at most revealed that defendant may have harbored some fear of future harm" and clearly was insufficient to require instruction regarding imperfect self defense. (*Manriquez, supra*, 37 Cal.4th at p. 582.)

Houston, 2010 WL 109714 at *4.

There is nothing in the record suggesting that the state court's determination was unreasonable. With one exception, all pieces of evidence adduced by petitioner fail to support his theory of imperfect self-defense because they do not show that petitioner actually believed that Leon posed an imminent danger. First, there is no evidence that, prior to the shooting, Schrader told petitioner—or anyone else, for that matter—that she had seen Leon put a gun in his car on the morning of the shooting. Thus, even if Schrader's testimony were accepted as true, the fact that Leon put a gun in his car that morning could not have caused petitioner to believe that Leon was a danger because petitioner was unaware of the gun. Similarly, petitioner's speculative explanation for why a gun was not found in Leon's car after the shooting—i.e, that someone removed the gun before the police arrived—is irrelevant because there is no evidence that at the time of the shooting petitioner had otherwise heard that Leon was carrying a gun in his car. Finally, the alleged retaliatory shooting of Burton does not support petitioner's argument because it is difficult

7

to comprehend how an act by a third party that occurred after petitioner shot Leon could somehow prove that petitioner previously believed that Leon was a threat. At best, Schrader's testimony and the alleged retaliatory shooting suggest that Leon and his associates were dangerous men. Nevertheless, petitioner could not have harbored a fear of Leon based on facts he did not know and events that had not yet taken place.

The only piece of evidence that tends in any way to support petitioner's theory of imperfect self-defense is Smith's statement to the police that petitioner had told her that Leon was going to kill petitioner but that petitioner had killed him first. (Ex. 3 at 770.) However, even assuming, purely for the sake of argument, that this is sufficient to show that petitioner believed Leon was a danger, it nonetheless fails to demonstrate that petitioner believed he was in *imminent* danger of death or great bodily injury. By all accounts, petitioner ambushed Leon in broad daylight and shot him with an automatic rifle while Leon was sitting in his car at a stop sign. It goes without saying that these are not the actions of a man who believes he is in *imminent* danger of death or great bodily injury from his victim.

Finally, even if the failure to instruct on voluntary manslaughter as a lesser-included offense of murder was somehow erroneous, petitioner fails to demonstrate that the error had a substantial and injurious effect in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Messer v. Runnels, No. 07-15151, 2009 WL 1464899, at *2 (9th Cir. 2009) (unpublished memorandum disposition) (applying Brecht in non-capital case to claim that trial court failed to instruct on lesser-included offense of involuntary manslaughter); Ghent v. Woodford, 279 F.3d 1121, 1133-34 (9th Cir. 2002) (applying Brecht to a capital case for failure to instruct jury on lesser-included offense). Given the evidence presented at trial, for all the reasons discussed above, a reasonable jury properly instructed on imperfect self-defense could not possibly have found that at the time of the shooting petitioner actually believed that Leon posed an *imminent* danger of death or great bodily injury. Therefore, the trial court's failure to instruct on imperfect self-defense did not result in prejudice.

1  Accordingly, petitioner is not entitled to federal habeas relief.

C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 17, 2014

_____
JON S. TIGAR
United States District Judge